**JUSTIN J. McCARTHY, ESQUIRE**
Attorney I.D. No. 20152
The Commons at Lincoln Center
118 John Robert Thomas Drive
Exton, PA  19341
(610) 363-6104

Attorney for Plaintiff **FILED**

SEP 2 1 2007

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALBERT J. McCARTHY
415 Hessian Drive
Kennett Square, PA  19348,
     Plaintiff
     vs.

: CIVIL ACTION - LAW

:

JEFFREY S. DARMAN
347 North Union Street
Kennett Square, PA  19348
     and
BOROUGH OF KENNETT SQUARE
120 Marshall Street
Kennett Square, PA  19348
     and
MARC D. JONAS, ESQUIRE
775 Penllyn Blue Bell Pike
Blue Bell, PA  19422
     and
GRACE M. DEON, Esquire
60 East Court Street
Doylestown, PA  18901
     and
RICHARD A. PESCE
355 North Lincoln Street
Kennett Square, PA  19348
     and
EMIDIO J. FALINI
221 Marshall Street
Kennett Square, PA  19348
     and
JOSEPH M. MAKOWSKI
605 Meadow Creek Lane
Kennett Square, PA  19348
     and

07  3958

:

:

:

:

:

DAVID B. MILLER                     :  NO.
312 South Broad Street
Kennett Square, PA  19348
        and
JEROME E. RHODES                   :
359 North Union Street
Kennett Square, PA  19348
        and
JOHN R. THOMAS                     :
406 South Broad Street, Apt. 1
Kennett Square, PA  19348,
        Defendants               :  JURY TRIAL DEMANDED

## COMPLAINT

### I. JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. §1983. Jurisdiction is based

upon 28 U.S.C. §§1331 and 1343(a)(3)(4). Plaintiff further invokes the supplemental

jurisdiction of this Court under 28 U.S.C. 1367(a) to hear and adjudicate pendent state

law claims.

2.     Venue is proper and lies in this Honorable Court in that plaintiff's federal

question and state law claims arose from acts and/or omissions occurring in the Eastern

District of Pennsylvania and all parties reside in this district.  28 U.S.C. §1391(b).

### II.     PARTIES

3.     Plaintiff, Albert J. McCarthy ("McCarthy"), is an adult individual and

citizen of the United States of America who resides at 415 Hessian Drive, Kennett

Square, Chester County, Pennsylvania.

4.     McCarthy is the Chief of Police of the Borough of Kennett Square,

Pennsylvania, having been duly sworn to that office on February 15, 1988. McCarthy

has served as Chief continuously since that date.

5.      Defendant, Borough of Kennett Square ("Borough"), is a Government Agency and Local Agency within the meaning of the laws of the Commonwealth of Pennsylvania. 2 Pa. C.S.A. §101 *et seq.*

6.      The Borough of Kennett Square is governed by a Mayor and Borough Council under 53 P.S. §45101 *et seq.* ("Borough Code").

7.      Defendant, Jeffrey S. Darman ("Darman"), is an adult individual and is a duly elected and sworn member of the Kennett Square Borough Council ("Council"). He resides at 347 North Union Street, Kennett Square, Chester County, PA. Darman serves as Council President.

8.      Defendant, Marc D. Jonas, Esquire ("Jonas") is an adult individual who has been continuously licensed as an attorney within the Commonwealth of Pennsylvania since 1972. His principal legal office is located at 775 Penllyn Blue Bell Pike, Blue Bell, Montgomery County, PA 19422. Jonas serves as Borough Solicitor, 53 P.S. §46116.

9.      Defendant, Grace M. Deon, Esquire ("Deon"), is an adult individual who has been continuously licensed as an attorney within the Commonwealth of Pennsylvania since 1992. Her principal legal office is located at 60 East Court Street, Doylestown, Bucks County, PA 18901. Deon serves as Assistant Borough Solicitor, 53 P.S. §46116.

10.     Defendant, Richard A. Pesce ("Pesce"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. Pesce serves as Council Vice President. He resides at 355 North Lincoln Street, Kennett Square, PA 19348.

3

11.     Defendant, Emidio J. Falini ("Falini"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. He resides at 221 Marshall Street, Kennett Square, PA 19348.

12.     Defendant, Joseph M. Makowski ("Makowski"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. He resides at 605 Meadow Creek Lane, Kennett Square, PA 19348.

13.     Defendant, David B. Miller ("Miller"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. He resides at 312 South Broad Street, Kennett Square, PA 19348.

14.     Defendant, Jerome E. Rhodes ("Rhodes"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. He resides at 359 North Union Street, Kennett Square, PA 19348.

15.     Defendant, John R. Thomas ("Thomas"), is an adult individual and duly elected and sworn member of the Kennett Square Borough Council. He resides at 406 South Broad Street, Apt. 1, Kennett Square, PA 19348.

16.     Plaintiff makes claim for relief against the above-named members of the Council of the Borough of Kennett Square, the Borough Solicitor and Assistant Solicitor in their official and individual capacities.

17.     At all material times, the defendant Borough, its Council members, Solicitor and Assistant Solicitor acted both individually and as willful participants in the joint activities set forth more fully below.

4

## III.  FACTUAL ALLEGATIONS

18.    On January 19, 1973, McCarthy was appointed and sworn as a patrolman in the Borough's Police Department.

19.    McCarthy completed his mandatory probationary period of not less than six months in or about July, 1973, at the close of which he became a permanent Borough police officer.

20.    At all material times, McCarthy, a tenured police officer, enjoys the protection of the Borough Code Civil Service Provisions for Police and Firemen. 53 P.S. §46171 *et seq.*

21.    Neither the defendants nor the Borough Manager had authority under the Borough Code to abrogate, alter, interfere with and/or take McCarthy's office as Chief of Police except in strict accord with the Civil Service provisions of the Borough Code and duly enacted Borough of Kennett Square Civil Service Commission Rules and Regulations currently in effect.

22.    Pursuant to the Borough Code, McCarthy reports only to the Mayor. Council and the Borough Manager have no authority over him. Thus, the Borough Manager's orders to McCarthy, discussed more fully below, were illegal and unenforceable.  See:  53 P.S. §46142.

23.    In or about 2001, McCarthy's rights to a pension for his years of service as a Borough Police Officer vested under the Municipal Police Officers' Retirement Act. Between 2001 and August 6, 2007, McCarthy was by law entitled to receive an annual pension benefit equal to approximately 46% of his then current pay if he had elected to retire as a municipal police officer when first eligible.

5

24.    Since 2001, McCarthy has remained an active police officer in his home town of Kennett Square to enjoy the psychological and emotional benefits he receives in the performance of his duties as a civil servant and police officer.  All the while, he has forfeited the aforementioned pension benefits.

### Negotiations for Renewal of Police Services
### Contract with the Township of Kennett

25.    For a period of approximately six years beginning in 2001, the Borough contracted with the Township of Kennett ("Township") to provide police services throughout the Township.  In that period,  McCarthy was listed as the Township's Chief of Police in at least one countywide directory.

26.    Throughout the period of the Borough Police Department's service to the Township, McCarthy, as necessary, reported to and obeyed the directions given to him by the Board of Supervisors of the Township regarding matters occurring there.

27.    At all material times, the Borough Council had full knowledge and consented to McCarthy's working relationship with the Township's Board.

28.    In or about late 2006 or early 2007, the Borough and the Township began negotiations on a new contract or an extension of the contract for police services. Ultimately, the Township did not renew the police services contract with the Borough in part due to a substantial cost increase sought by the Borough.

29.    On March 31, 2007, the Township voted not to renew its police services contract with the Borough.

30.    Between March and June, 2007, the Township received proposals from other Chester County police departments and police officers offering to provide police services for its citizens.  The Township interviewed representatives of two other Chester

County Police Departments to assess whether to place the police services contract with either of them.

31.    After the Township made a preliminary decision not to renew or extend its contract with the Borough, McCarthy attempted to re-engage the Township and Borough in negotiations. As part of his efforts, McCarthy attempted to reconcile the parties' differences by proposing a meeting between the Mayor of the Borough, the Borough Manager and the Township Board of Supervisors.

32.    The meeting occurred though the Mayor was unable to attend. Afterwards, Darman vehemently opposed the consensus reached by the meeting participants saying that if he agreed to the terms of the newly proposed contract: ". . . it would look like I gave in."

33.    In the spring of 2007, the Township Board, without an inquiry or solicitation from McCarthy, asked his interest in establishing a part time police department for the Township.

34.    After initially twice rejecting the Township's offer of employment, the Township again approached McCarthy, without solicitation, seeking his reconsideration of his decision not to accept employment with the Township.

35.    On or about June 7, 2007, McCarthy tentatively accepted the Township's offer and announced his intention to retire as Chief of Police in Kennett Square effective July 31, 2007.

36.    Subsequent to McCarthy's announcement of his intentions, several county and local newspapers published articles and an editorial praising him for his police services, community service and voluntary charitable endeavors.

7

37.    McCarthy reasonably believes that Darman and other defendants were agitated with the Township's offer of a position to McCarthy and the possibility that McCarthy might accept that position and create a new police department for the Township, thereby ending the Borough's possibility of renewing that contract.

38.    McCarthy also avers on information and belief that Darman was also exceedingly jealous of the favorable notoriety McCarthy had received in several publications.

39.    McCarthy avers on information and belief that in retaliation for the matters set forth above Darman made comments for publication to the *Chester County Press,* a county newspaper, in which he deliberately, maliciously and/or recklessly defamed McCarthy and/or invaded his privacy by casting him in a bad light. In that conversation, Darman disclosed confidential information pertaining to Borough and Police Department personnel matters.

40.    On July 26, 2007, at the direction of Darman, The Borough Manager issued a letter to McCarthy in which he specifically mentioned the possibility of McCarthy accepting a position as Chief of Police in the Township and threatened discipline against McCarthy if he performed any services for the Township before his "separation" on July 31, 2007.

41.    Contrary to the Borough Manager's repeated statement in that letter that McCarthy was "being separated" from his position as Borough Chief of Police, the Borough had no lawful grounds to terminate him.   McCarthy had only informed the Borough of his intention to retire.

8

42.    In the July 26, 2007 letter, the Borough Manager also directed McCarthy summarily to surrender certain Borough property to the Borough Manager, giving McCarthy orders that were only the Mayor's to issue.

43.    At no time on or before July 30, 2007 had the Borough Council accepted McCarthy's resignation and McCarthy never took measures to process an application for retirement with the Municipal Police Officers' Retirement Fund.

44.    On July 30, 2007, McCarthy notified the Borough that he did not intend to retire as Chief but instead would remain in his job.

45.    In view of his tenure, McCarthy had the exclusive right to determine whether he would retire or not retire and when he might do so. The defendants could not then procure, demand, coerce or obtain McCarthy's non-consensual departure, except by illicit means.

46.    McCarthy's July 30, 2007 memo was received with great consternation and frustration by the Borough Council which coveted his removal as Chief, in part, for the improper reasons outlined below.

### Solicitor Jonas's Illegal Scheme to Remove Chief McCarthy in Clear Violation of Federal and State Law

47.    McCarthy avers on information and belief that in the days immediately after the Borough Council received his decision to remain Chief on July 30, 2007, Solicitor Jonas, aided and abetted by Assistant Solicitor Deon and possibly a third attorney consultant the Borough employed as a police personnel expert, conceived a scheme for implementation by the Borough Council to coerce and/or intimidate McCarthy into retiring and/or to unlawfully remove McCarthy from his tenured office in violation of clearly established law.

9

48.    In a Friday, August 2, 2007, 12:01 P.M. e-mail to Mayor Leon R. Spencer, Jr., Jonas wrote:

> **Leon – Good to speak to you today.  Please continue your efforts to convince the chief to do the right and the honorable thing-to fulfill his public announcements of his intention to resign-for the benefit of the borough, . . .**
>
> ★★★
>
> **The special meeting Monday night could result in a decision to terminate, demote or suspend the chief, unless he voluntary (sic) steps aside, or unless you take dispositive action before then.  I continue to hope that you can prevail upon the chief, so that you can swear in the lieutenant, as you intended to do yesterday.**
>
> **At the very least, it is very possible that the chief will be suspended, with pay, . . .**

49.    McCarthy avers on information and belief that at that time, the defendants, particularly Darman and Jonas, also intended to damage his good reputation maliciously and without justification.

50.    In the summer of 2006 and continuing into 2007, a Borough patrolman was under investigation for misconduct.  Jonas and Deon represented the Borough in that matter.  McCarthy perceived from the Solicitor's work product that they did not have an adequate understanding of police personnel law.

51.    Accordingly, in November, 2006, McCarthy had recommended to the Council, Mayor and Borough Manager that they engage replacement counsel for Jonas and Deon with ". . . an attorney . . . who specializes in police conduct because this is a unique area of the law. . . [observing that Deon] and another lawyer she hired . . . were not sufficiently versed in police cases."

52.    On August 6, 2007, at the direction of the Borough Council and without any prior notice to McCarthy, the Borough Manager delivered a two-page letter to McCarthy which states in part: ". . . I have been directed by the Borough Council to

place you on a work status of administrative leave with pay, effective immediately." The Borough Manager's letter states that the action was taken "**because of, among other things, the unexpected nature of your change in plans. . . .**" A copy of the August 6, 2007 letter is attached hereto as Exhibit "A" and incorporated herein.

53.    In Exhibit "A," the Borough Manager relieved McCarthy of his "**responsibility to report to work. . .**" [and ordered him to forward to] "**. . . the Mayor or Lt. Edward Zunino all inquiries and matters related to Police Department Administration or Operations.**"

54.    The Borough Manager also directed McCarthy [by August 7, 2007]: "**. . . to return to Lieutenant Zunino all Borough property issued to you, including, but not limited to, all keys, passwords, equipment and/or other property issued to you. This includes both your gun and your badge.**"

55.    Despite the Borough Council's duty to do so, it did not provide McCarthy with a ". . . written statement of any charges made against [him] . . . ." See: 53 P.S. §46190 as there were none to proffer.

56.    On August 7, 2007, McCarthy surrendered his badge, his weapon, each and every uniform item in his possession, his keys to the police station, his patrol car and all other Borough property in his possession.

57.    McCarthy complied with the instruction he received from the Council reluctantly believing the Council's directive to be a violation of clearly established law. He only did so to avoid the imposition of further unlawful sanctions against him by the Council and to ensure the continued harmonious operation of the Borough's Police Department without interruption.

58.    Although the Borough Manager's letter of August 6, 2007 reminded McCarthy that he remains a Borough employee and Chief of Police, the assertion was a pretext. In actuality, McCarthy has been prevented from performing any of his duties since that date and was essentially fired that day.

59.    Neither the Borough Code nor the duly enacted Borough of Kennett Square Civil Service Commission Rules and Regulations ("CSCRR") currently in effect make provision for the placement of a tenured Borough police officer on paid "administrative leave."

60.    On August 8, 2007, McCarthy submitted a letter to the Borough Manager informing the Council that he would not accept compensation from the Borough while he was wrongfully prevented from performing all the duties of Chief of Police of the Borough of Kennett Square. He felt that it would be unethical to do so.

61.    On August 9, 2007, McCarthy received a second letter from the Borough Manager stating: ". . . the Borough considers you an active employee on paid administrative leave."

62.    In its August 9, 2007 letter/directive, which was clearly in retaliation for McCarthy's declination of compensation from the Borough during the period in which he is illegally listed by the Borough as on administrative leave, the Borough Manager informed McCarthy that the Borough intends to "draw down" money from his accrued vacation and holiday account to purportedly **pay him** for services performed **after** August 9, 2007.

12

63.    In actuality, the "draw down" monies had been earned by McCarthy for work he did before August 6, 2007. Thus, the Borough began *paying* McCarthy from his past earnings.

64.    In an effort to mollify the reaction of the citizens of Kennett Square to its *de facto* removal of McCarthy as Chief of Police, and in an attempt to feign compliance with the strictures of the Borough Code that specifically forbade their actions, the Council claimed publicly that it was compensating McCarthy. This was yet another pretext to obfuscate its punitive and wrongful taking of his tenured job.

65.    The Council did not request nor did it receive McCarthy's permission to treat his accrued holiday and vacation pay and compensatory time as current compensation for service after August 9, 2007. The Borough was not authorized by law to do that.

66.    On August 6, 2007, the defendants knew that with the consent of the Borough, McCarthy had for a period of 35 years been simultaneously employed as a Chief of Police and as a building contractor. During that time, McCarthy has gratuitously provided numerous hours of services as a contractor to the Borough of Kennett Square, including the conversion of an ambulance/rescue garage into the Borough Police Station.

67.    In further baseless and unlawful retaliation against McCarthy, the defendants have abrogated McCarthy's right to pursue outside employment. In the Borough Manager's August 6, 2007 letter, he instructs McCarthy:

> Please also know that it is the Borough's expectation that your Kennett Square Borough position will remain your primary employment during this period of paid administrative leave. You are not permitted (either under the handbook or under the Borough's expectations for your employment) to hold two full-time jobs at one time. This includes working for Kennett Township while employed by Kennett Square

13

Borough. Although I am sure it unnecessary to mention, I am compelled to remind you that failure to adhere to this standard may lead to the imposition of discipline.

68.     Under the Police Collective Bargaining Agreement, other Borough regulations and a 35 year consensual understanding, the Borough permitted McCarthy and other Borough police officers to work at jobs other than as Borough police officers and it could not prevent McCarthy from rendering voluntary service to a neighboring township while a Borough employee. Numerous Borough police officers work or have worked simultaneously for other police departments.

69.     As they had schemed to do prior to the scheduled August 6, 2007 public Council meeting, the Council did unlawfully discuss publicly that it contemplated bringing certain unknown disciplinary charges against McCarthy though he had not been notified by any representative of the Borough that **any act or omission** on his part up to that date constituted a violation of law or regulation or warranted sanctions. Given his excellent work, no notice was warranted.

70.     The impression conveyed deliberately by the Council to the public was that McCarthy had committed improper or illegal acts. In the wake of their actions against the Chief, the citizens in attendance demanded that Council disclose the grounds for their action. It refused, stating repeatedly that it was "a legal matter."

71.     On **August 15, 2007**, McCarthy filed a civil action in the Court of Common Pleas of Chester County ("State Court Action") against all the defendants in this action except Jonas and Deon, the Borough's solicitors, seeking injunctive relief.

72.     Before service was made of the aforementioned State Court Action, McCarthy withdrew the matter without prejudice.

14

73.    In his Complaint in the State Court Action at paragraph 43, McCarthy averred that the Borough and its Council had failed to comply with Section 7.3 of the Borough of Kennett Square's Civil Service Commission Rules and Regulations ("CSCRR") entitled "pre-termination hearing" and noted that the Section specified that **prior to any formal action that would result in demotion, suspension or removal of an officer**, an officer must be provided written notification of the contemplated action, a brief explanation of the nature of the charges and the date, place and time when an informal hearing on those charges will be held.

74.    In his Complaint in the State Court Action at paragraph 44, McCarthy averred that he had not been provided with written notification of contemplated action by the Borough of any misconduct on his part and/or the place and time of the hearing to be held on any putative, or alleged reasons for his placement in the status of "administrative leave."

75.    In his Complaint in the State Court Action at paragraph 45, McCarthy averred that Section 1 of the CSCRR contained definitions applicable to those regulations and noted that the term "administrative leave" is not set forth in the CSCRR definition section nor does that term appear in Pennsylvania's Borough Code.

76.    In his Complaint in the State Court Action at paragraph 46, McCarthy averred as follows:

> If the illegal status of "administrative leave" into which the defendants have placed McCarthy is based on specific charges, the Borough through its counsel was required to specify the exact sub-sections of Section 7.2 of the CSCRR that McCarthy violated and to provide McCarthy an explanation of the factual circumstances on which it relied in reaching its findings.

15

77.    In his Complaint in the State Court Action at paragraph 47, McCarthy averred as follows:

> Under Section 7.4, **"Notice of Action of Charges,"** of the CSCRR, McCarthy avers that the Borough had five days following the action it took on August 6, 2007 to provide McCarthy with the reasons for his placement in the undefined and illegal category of "administrative leave" and an explanation of his appellate rights and to have delivered that statement by personal service or certified or registered mail and concurrently filed the charges with the Civil Service Commission of the Borough.

78.    In his Complaint in the State Court Action at paragraph 48, McCarthy averred as follows:

> Under Section 7.5 of the CSCRR, an officer who has been suspended, removed or reduced in rank has certain appellate rights.

79.    In his Complaint in the State Court Action at paragraph 49, McCarthy averred as follows:

> McCarthy, however, has been denied <u>any</u> right to challenge the Borough Manager's unlawful action.

80.    In his Complaint in the State Court Action at paragraph 50, McCarthy averred as follows:

> McCarthy is in a position from which he can neither extricate himself at a due process hearing or from which he may appeal to this Honorable Court.

81.    The *Daily Local News* of West Chester, Pennsylvania, a countywide daily newspaper, on page one of its August 16, 2007 edition featured a picture of McCarthy and reported as its lead story that McCarthy had filed a State Court Action and withdrew it that same day. Though not served, the State Court Action came to the attention of the defendants including Solicitors Jonas and Deon. Undoubtedly, defendants obtained a copy of McCarthy's Complaint in the State Court Action.

82.     Throughout his tenure as Chief of Police, McCarthy, with the knowledge and consent of the Borough Council, had afforded any of those officers in his charge who were suspected of disciplinary infractions a private, confidential, name-clearing hearing pursuant to the CSCRR and the provisions of *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487 (1985), all in an effort to resolve allegations quietly if possible.

83.     The goal and purpose of *Loudermill* is to provide an employee a chance to confidentially set the record straight and get an alleged officer back to work. McCarthy had in fact accorded a *Loudermill* hearing to one of his officers as recently as September, 2006. It was that officer's second *Loudermill* hearing. The first hearing effected the change of conduct sought without the need for further disciplinary procedures.

84.     The defendants ignored their duty to McCarthy under *Loudermill* and the CSCRR and instead **publicly** claimed that "legal action" justified their taking of McCarthy's duties. They did so willingly and with actual malice to injure his good name and reputation and to cast him in a bad light.

85.     McCarthy's State Court Action exposed defendants' blatant failure to comply with the mandates of *Loudermill* and their own civil service regulations and denial to McCarthy of due process of law; notwithstanding the defendants' awareness of the State Court Action, since August 16, 2007 defendants have continued their oppressive actions and persisted in their official misconduct without correction or abatement to the present.

86.     The Borough Manager on August 22, 2007 at the direction of the Council forwarded a pretexual *Loudermill* notice to McCarthy. This was 16 days after the Council had punished and injured him in public.

87.     On August 29, 2007, McCarthy rebutted each and every bogus claim in the Borough's August 22, 2007 *Loudermill* notice, observing that the Borough had, among other things, ignored their own official records and past practices and agreements concerning its Chief of Police in its effort to retaliate against him, had clearly violated his rights under state law, the Borough's own rules and regulations and the United States Supreme Court's decision in *Loudermill.*

88.     In his August 29, 2007 response, McCarthy notified the defendants that its actions were unlawful and retaliatory and, in part, were the result of his decision not to retire, his consideration of an offer of employment as Chief of Police from the Township of Kennett and the Township's offer itself. Furthermore, McCarthy in his letter advised the Borough that personal and political reprisal against a police office were a clear violation of the Borough Code, citing 53 P.S. §46190.

89.     The defendants also deliberately misled McCarthy in the Borough Manager's August 6, 2007 letter by stating that McCarthy had been placed on "administrative leave." This statement is not true.

90.     In an attempt to determine why the media was reporting that he had been suspended from duty, on or about September 3, 2007 McCarthy reviewed the Borough Council proposed meeting minutes of its August 6, 2007 meeting posted publicly on the worldwide web on the Borough's website.

91.    McCarthy was shocked and distressed to learn for the first time that the Borough had passed a motion suspending him from duty. Defendants, however, did not provide him notice that he was suspended. By this time, the law and plain decency required defendants to tell McCarthy exactly what they did to him.

92.    On September 10, 2007, the Council approved the meeting minutes of their August 6, 2007 public meeting without amendment. Defendants still have not, however, notified McCarthy that he has been suspended.

93.    At its public Council meeting on September 10, 2007, the Borough Council passed three motions regarding McCarthy. In the first, it adopted the July and August letters submitted to McCarthy by the Borough Manager as their own. Second, it announced that McCarthy was sent a *Loudermill* notice and, thirdly, the Council moved to commission an investigation of unspecified disciplinary infractions by McCarthy. Defendants thereby inflicted additional damage to McCarthy's good name and reputation.

94.    On September 15, 2007, McCarthy received a second *Loudermill* notice signed by Darman for and on behalf of the Council requesting that McCarthy rebut additional, concocted, pretexual, baseless allegations. Darman, despite the Mayor's exclusive authority over the Borough Police Department, ordered a policeman to deliver the letter to the McCarthy home on Saturday afternoon.

### Background for and Sequence of Events Leading to Borough's Letter of August 6, 2007 to McCarthy

95.    In or about the spring of 2001, St. Patrick's Roman Catholic Church ("St. Patrick's") of Kennett Square, PA applied for permission to build an addition to its elementary school at the corner of Cypress and Meredith Streets in the Borough.

96.    Sixteen hearings were held on St. Patrick's application to the Borough's Zoning Hearing Board between June 26, 2001 and March 3, 2003.

97.    Jonas represented the Borough in that matter and was retained by the Borough in part because of his earlier opposition to the zoning applications by churches of the Archdiocese of Philadelphia ("Archdiocese").

98.    McCarthy was called as an expert witness by St. Patrick's and testified on two occasions. Jonas also notified McCarthy that he might be called as a Borough witness.

99.    The Zoning Hearing Board found in favor of the Borough and denied St. Patrick's application.

100.    The Borough Council adopted the recommendation of the Zoning Hearing Board and St. Patrick's appealed to the Court of Common Pleas of Chester County.

101.    On September 25, 2005, the Honorable Jacqueline C. Cody issued an Opinion reversing the decision of the Zoning Hearing Board and granting St. Patrick's permission to proceed in accordance with its application.

102.    Subsequent to Judge Cody's decision, St. Patrick's filed suit under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000, *et seq.*, 42 U.S.C. §1983, in this Honorable Court. Named as defendants were the Borough of Kennett Square, Borough of Kennett Square Council, Emidio J. Falini, Jeffrey S. Darman, Richard A. Pesce who are, likewise, defendants in this action.

103.    Ultimately, the Borough was persuaded to settle St. Patrick's religious discrimination action. As part of the settlement, all further appeals in the state courts

were withdrawn and the Borough granted St. Patrick's the permission it sought initially in 2004.

104.    Following Judge Cody's decision, Darman told McCarthy that McCarthy's sworn testimony before the Borough Zoning Board hearings should have been "more for the Borough."

105.    Between 1988 and 2005, McCarthy enjoyed a reasonably good working relationship with the Borough's Council; however, following the settlement of the religious discrimination action brought by St. Patrick's, the Borough Council's attitude toward McCarthy changed and their treatment of him became decidedly negative.

106.    After the settlement, the Borough Council as a whole stopped all meetings with McCarthy, never met with him again and directed that thereafter McCarthy *not* be copied on Borough e-mails.

107.    In the years between 2004 and July of 2007, the Borough Council has acted repeatedly to usurp the Mayor's authority as the executive in charge of the police force. The Mayor publicly supported St. Patrick's application to build an addition to its school.

108.    Often, Council took actions regarding the Borough Police Department contrary to the Borough Code and in clear derogation of the Mayor's authority.

109.    At all material times beginning in or about January, 2006, the Borough Council coveted executive and administrative authority over the Borough's police force which is forbidden to it under the Borough Code.

110.    At all material times, the Borough Council through its President, Darman, attempted to interfere with and/or interfered with the Borough's operation of the Police Department and particularly McCarthy's supervision of it.

111.    McCarthy avers on information and belief that at one point, Darman threatened to deny McCarthy his long vested benefit of a police patrol car for his use 24 hours a day, seven days a week and his authority to prepare the department's annual budget in part in retaliation generally for McCarthy's activities as head of the department and specifically for his testimony in the St. Patrick's zoning case.

112.    McCarthy avers on information and belief that Darman seeks the power to control the police department and  most administrative authority in the Borough.

113.    McCarthy avers on information and belief  that Darman attempted to and/or did interfere with the Mayor's role in development activities in the Borough, excluding the Mayor from communications and meetings in which the Mayor of the Borough by custom, policy and courtesy should have been involved.

114.    Beginning in or about the summer of 2006 and continuing in or about May 2007, the Council was aware of serious disciplinary infractions committed by a Borough patrolman.

115.    In response to the officer's actions, McCarthy recommended the officer's dismissal, believing reasonably that he presented a threat of harm to his fellow officers and the community at large.

116.    Jonas and Deon were retained to prosecute the case against the officer.  By reason of their failure to act promptly and effectively on that matter, the investigation and

disciplinary process extended over a period of 10 months, during which time the suspect officer received his full pay from the Borough.

117.    McCarthy believes that Darman, Jonas and Deon either deliberately and by design or through ineptitude maneuvered the Borough Council to reject his recommendation and to accede to the demands of the officer's defense attorney that the officer receive only minor sanctions. This was done in the face of McCarthy's belief that the officer presented a danger to the community.

118.    The officer's misconduct had been brought to McCarthy's attention by the officer's immediate supervisor after McCarthy returned from vacation in New Jersey.

119.    Over McCarthy's protests to Deon, the personnel matter pertaining to the suspect officer's misconduct was protracted through the fall of 2006 and into late spring of 2007.

120.    McCarthy avers on information and belief that the Borough Council's action to retain the aforementioned officer was intended to undermine McCarthy's leadership of the Police Department and to frustrate him in an effort to compel or persuade him to retire as Chief.

121.    McCarthy believes that as early as 2005, Darman wanted a new Chief of his choosing and to oust McCarthy from office.

122.    In or about 2004 or so, McCarthy received a call from the Washington, DC area from a person claiming to be a Police Captain. He made a general inquiry of McCarthy of Pennsylvania's requirements for certification. When McCarthy asked "where he was going," the caller said: "Your job. Aren't you retiring?" when asked who told him that, the caller said: "Jeff Darman."

23

123.    The Council had made inquiry of McCarthy in the spring of 2007 through the Borough Manager as to the amount of money for accrued holiday, vacation and compensatory time that would have to be paid to McCarthy "to buy him out'.

124.    On or about April 2007, the Borough Treasurer provided McCarthy with two Borough records, one of which stated that McCarthy's accrued vacation and personal pay was $78,543.52. One record, entitled "Entitlement Hours for Vacation, Personal and Holiday Time from 1988-2007" listed his accrued time.    McCarthy's rough approximation of his earned compensatory time was $25,000 as of May 2007. When the Borough records of his entitlements are converted to dollar amounts, they establish that the Borough owes McCarthy approximately $88,773.28 for vacation, personal and holiday pay.

125.    In or about 1988 when McCarthy became Chief, as an inducement to his acceptance of the Chief's job, the President of Council of the Borough promised McCarthy that any vacation, holiday and/or compensatory time which he earned but for which he did not receive payment as accrued would be paid to him upon retirement.

126.    Several other Borough Council Presidents and Borough Managers have reassured McCarthy that he would be paid these accruals upon retirement.

127.    The Borough payroll records show a carry forward of the accrued vacation and holiday pay for each year beginning in 1988 to the present.  From time to time over the past 20 years, McCarthy was provided copies of the Borough's records showing the accruals.

128.    At no time during the past 20 years did any Borough official inform McCarthy that he would forfeit any unused vacation, holiday pay and/or compensatory

time if not used during the fiscal year in which it was earned. To the contrary, some Borough Managers urged him to use the time to reduce the payroll accrual to him by the Borough.

129.    Many other Borough employees were offered and relied on the Borough's promise to this effect, as McCarthy has. Several have been paid significant amounts for accrued pay upon their retirements for years of accrued time. A Borough memorandum dated September 28, 2005 lists that Borough payroll accrual for each police officer. The total debt on September 28, 2005 was $25,145.88.

130.    McCarthy justifiably relied on the inducements of the Borough and its officials and continued to work on holidays including Christmas and Thanksgiving and to decline vacation days in an effort to ensure that the Borough was provided police services 24 hours a day on a seven day a week basis.

131.    By filling patrol shifts for officers during their training, court appearances or on their holiday and vacation days and when he could have been on vacation, McCarthy saved the Borough of Kennett Square tens of thousands of dollars during his 20 year tenure.

132.    In addition, during his administration of the police department, McCarthy surrendered a surplus to the Borough treasury in all but one of the years he served as Chief of Police.

133.    Over the past 20 years, numerous criminal investigations, including as many as a dozen homicides, required the Borough's police officers to work substantial overtime. It was to replace those hours in many instances that McCarthy worked on holidays and declined to take his vacations.

134.    In its letter of July 26, 2007, despite its earlier admissions to McCarthy, the Council informed McCarthy that it would pay him only $5739.52 for his unused vacation and that it denied him any payment for holiday and personal days. Additionally, the Borough calculated McCarthy's entitlement to compensatory time at $9062.40, noting that McCarthy was an exempt employee under the Fair Labor Standards Act and therefore not entitled to overtime pay.

135.    Though forbidden by law from discussing possible disciplinary matters under investigation in public, the Council Members with the knowledge, consent and participation of their Solicitor and Assistant Solicitor on August 6, 2007 and on September 10, 2007 publicly stated that McCarthy was under investigation for disciplinary infractions.

136.    As of July 30, 2007, however, no one had suggested or intimated in any way that McCarthy had committed an act or omission for which he could be sanctioned. However, the Borough Council's July 26, 2007 letter to McCarthy states that he may be subject to the imposition of discipline if he performed any work for the Township of Kennett.

137.    On or about August 3, 2007, Jonas and Darman spoke with an assistant editor of the *Daily Local News* ("DLN"), a newspaper of general circulation in Chester County, in the wake of McCarthy's decision not to retire. Jonas is quoted by the editor of that paper as lamenting that if McCarthy doesn't leave Kennett Square and get on with his job in Kennett Township as its Chief, he will "tarnish" a lifetime of service to the Borough, categorizing the issue as financial.

138.   Jonas knew on that date that in its letter of July 26, 2007 the Borough had submitted a threatening letter to McCarthy, in part, to retaliate against McCarthy for having obtained the Kennett Township police work.  Thus, on August 3, 2007, Jonas made misleading statements to the DLN invading McCarthy's right to privacy by casting him in a bad light.

139.   On the date of the aforementioned editorial's publication, Jonas knew that no disciplinary or adverse employment action of any type was contemplated against McCarthy, nor was any warranted.

## IV.    DENIAL OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS OF LAW

140.   At all material times, defendants acted under color of state law.

141.   Defendants have deprived McCarthy of both procedural and substantive rights to due process of law under the Fourteenth Amendment, United States Constitution, U.S.C. Const. Amend 14, 42 U.S.C. §1983 and the Borough Code, 53 P.S. §§45101, *et seq.*

### McCarthy's Protected Property Interest

142.   McCarthy's February 15, 1988 appointment as Chief of Police was made in accordance with the Borough Code Civil Service Provisions for Police and Firemen and the Borough's CSCRR.  53 P.S. §46171 *et seq.*

143.   The Council by law is authorized to discharge certain executive, legislative, administrative and adjudicative functions.  53 P.S. §45806.

144.   The Mayor of the Borough, however, has full charge and control of the Chief of Police and the police force and he alone shall direct the time during which, the

27

place where and the manner in which the Chief of Police and the police force shall perform their duties. 53 P.S. §461121.

145.    The statutory authority of the Borough Council in regard to the actual operation of the Borough's Chief of Police and the Borough's police force is essentially limited to: ". . . fix[ing] and determin[ing] the total weekly hours of employment that shall apply to the policemen." *Id.*

146.    The Borough Code, 53 P.S. §45101, *et seq.* ("Borough Code") does not authorize a Borough Council to place a tenured Chief of Police protected by Civil Service "on administrative leave."

147.    Pursuant to Section 1121 of the Borough Code, 53 P.S. §§46121, the Borough Council is expressly forbidden from interfering with the Mayor's charge and control of the Police Chief and the Borough police force.

148.    The Borough must by law comply strictly with the Civil Service provisions of the Borough Code For Police and Firemen presently in effect. 53 P.S. §§46171 *et seq.* Likewise, the Council must comply strictly with the Borough of Kennett Square Civil Service Commission Rules and Regulations, adopted February 2, 2004 as amended February 6, 2006.

149.    Under Section 1190 of the Borough Code, the Council may not remove, suspend or reduce a tenured police officer in rank except for the following reasons:

> **(1)    Physical or mental disability affecting his ability to continue in service, in which cases the person shall receive an honorable discharge from service.**
> **(2)    Neglect or violation of any official duty.**
> **(3)    Violation of any law which provided that such violation constitutes a misdemeanor or felony.**
> **(4)    Inefficiency, neglect, intemperance, immorality, disobedience of orders, or conduct unbecoming an officer.**

28

**(5)    Intoxication while on duty.**
**(6)    Engaging or participating in conducting of any political or election campaign otherwise than to exercise his own right of suffrage.**

53 P.S. § 46190.

150.    The powers and duties of the Borough Manager are defined in the Borough Code and none of those duties involve control and/or operation of the Borough's Police Chief or Police Department, 53 P.S. §46142.

151.    At all material times, the Mayor of the Borough of Kennett Square did not delegate to the Borough Manager any of his non-legislative and/or non-judicial powers and duties and particularly the Mayor's exclusive right to direct when, where and how the Chief performs his police functions.

152.    The Civil Service provisions of the Borough Code exist to protect police officers with permanent appointments from ". . . religious, racial or political [retaliation]."  53 P.S. §46190.

153.    McCarthy enjoys a protected property right in his office as Chief under the Borough Code.

154.    McCarthy's property right is "fundamental" under the Constitution of the United States and is, therefore, to be protected by due process of law.

155.    Although the defendants claim that McCarthy is currently serving as Chief of Police of the Borough and remains in a full employment status with the municipality, its actions have denied McCarthy his protected property interest in the position of Chief. He was *de facto* terminated on August 6, 2007.

156.    The defendants' claim is a pretext to mask a wrongful termination of McCarthy and/or constitutes a constructive discharge.

157.    Defendants have engaged in a pattern and plan to harass, intimidate and oppress McCarthy. By their illegal actions to coerce him to retire the defendants have made McCarthy's life as a Borough employee intolerable.

158.    Defendants have acted intentionally and/or with deliberate recklessness.

159.    Defendants have exhibited a callous indifference to McCarthy's statutory and constitutional rights.

160.    Defendants' actions shock the conscience.

161.    Defendants' violation of McCarthy's civil and constitutional rights and the denial of any remedy to him is a continuing one.

### McCarthy's Protected Liberty Interests

162.    At all material times, McCarthy has a protected liberty interest in his good name and reputation.

163.    The methods used by the defendants to effect the outright termination of McCarthy's employment and/or its constructive discharge of him, created a false and defamatory impression publicly concerning McCarthy, thereby depriving him of a protected liberty interest, that is, his good name and reputation.

164.    The defendants by publicly announcing at its August 6, 2007 and repeating and reconfirming at its September 10, 2007 Borough Council meetings that McCarthy was under suspicion of and being investigated for disciplinary actions as Chief of Police stigmatized his hard-earned, good reputation.

165.    At all material times, defendants created a veil of suspicion around McCarthy at its public meetings and damned him by innuendo in an attempt to destroy his good name and reputation.

166.    Since early August, 2007, McCarthy has encountered numerous citizens in the Borough who have approached him to discuss the defendants' wrongful actions. Some of these persons displayed an aura of suspicion and standoffishness.

167.    The defendants' deliberate, premeditated and malicious intent at its public Council meetings and in comments to the media was to create the impression that the Chief of Police was not an honorable person, not a good Chief of Police and had violated the law.

168.    The aforementioned conduct of the defendants invaded McCarthy's right to privacy and cast him in a bad light.

169.    In a further deprivation of his protected liberty interests, the defendant Councilmen forbade McCarthy from full-time outside employment while allowing other Borough employees the right to hold two jobs and also ordered him illegally not to donate services to the Township.

## V.  **STATE LAW CLAIMS**

### **McCarthy vs. All Defendants**

**A.**    **Intentional Infliction of Emotional Distress**

170.    McCarthy incorporates by reference in this section the averments of paragraphs 1 through 169, as set forth above.

171.    By their actions, defendants caused McCarthy mental, emotional and psychological distress which resulted in physical injury to his person.

31

**McCarthy v. Darman and Jonas**

**B.**    **Invasion of Privacy by Casting in a Bad Light**

172.    McCarthy incorporates by reference in this section the averments of paragraphs 1 through 171, as set forth above.

173.    Defendant Jonas' August 2, 2007 statement to Mayor Spencer that McCarthy by not moving on to Kennett Township would tarnish his good name and reputation made a self-fulfilling prophecy.  Obviously, Jonas knew before that date that the defendants then possessed the malevolent objective of defaming McCarthy publicly.

174.    At all material times, defendants knew that the impression they would create by their public motion to suspend McCarthy was based on a contrivance and not on actual, true fact.

175.    The malicious and illegal public vote to suspend McCarthy was published in several newspapers of general circulation in Chester County, subjecting McCarthy to scorn and ridicule.

176.    In its June 20, 2007 edition of the *Chester County Press*, reporter Steve Hoffman reported upon the reasons for the failure of the Borough and Township to reach a new police services contract.  In that article, Darman stated falsely and with malice towards McCarthy:  "It appears that at the same time [the township was in negotiations with the Borough to renew the police contract] the chief was negotiating with them for employment.  It's a little disconcerting."  These statements were willful, are false and were made with actual malice.

177.    Darman's comments made to the *Chester County Press* on or about June 20, 2007 about McCarthy and his confidential police personnel matters were made by Darman in his individual capacity and were *ultra vires*.

178.    Darman's *ultra vires* comment invaded McCarthy's protected right to privacy and confidentiality under Pennsylvania law.

179.    At all material times, Darman acted to retaliate against McCarthy in a quest to destroy McCarthy personally and professionally.

## McCarthy v. Jeffrey S. Darman and Marc D. Jonas

**C.    Defamation and Invasion of Privacy**

180.    McCarthy incorporates by reference in this section the averments of paragraphs 1 through 179, as set forth above.

181.    Jonas called the editor of the *Daily Local News* and spoke to him concerning confidential Borough police personnel matters.  In an editorial of August 3, 2007, the editor attributed comments to Jonas to the effect that if McCarthy did not move along to employment with Kennett Township, he would tarnish his good name and reputation.  This became a self-fulfilling prophecy as Jonas knew on that date of the defendants' then objective of defaming McCarthy publicly

182.    In comments to Steve Hoffman, a reporter for the *Chester County Press*, reporting upon the reasons for the failure of the Borough and Township to reach a new contract, in an article published on June 20, 2007, Darman stated with malice as follows: "It appears that at that same time the Chief was negotiating with them for employment. It's a little disconcerting."  Darman knew this statement was false.

183.    At all material times, Jonas aided and abetted Darman, who acted in his individual capacity, to defame McCarthy with actual malice.

## McCarthy v. Borough of Kennett Square

**D.    Breach of Express Contract/Promissory Estoppel Contract Implied at Law**

184.    McCarthy incorporates by reference in this section the averments of paragraphs 1 through 183, as set forth above.

185.    McCarthy seeks compensatory damages of $88,773.28 as delineated in paragraph 124, above, plus interest for accrued holiday pay, vacation pay and compensatory time owed to him by the Borough.

186.    As averred above, the Borough through its agents and representatives, including the President of Borough Council and other Borough officials and Managers, at various times between 1988 and the present, induced McCarthy to work on days when he otherwise would be permitted vacation and/or a holiday and/or to work overtime (in amounts approaching 80 hours a week) with the promise that the accrued amounts in these categories would be paid to him upon his retirement.

187.    The aforementioned Borough employees knew that their promises to McCarthy would have been reasonably expected by him to include his forbearance from using the accrued time earned in a particular fiscal year.  McCarthy refrained from seeking his accrued vacation, holiday and personal time, each year relying on the Borough's promises that he assumed were made in good faith.

188.    If the Borough's promises to McCarthy are not honored, an injustice will be done to McCarthy.

34

189.    The Borough's business records corroborate implementation of the Borough's plan to pay McCarthy the aforesaid sums upon his retirement.

190.    It was the policy and practice of the Borough to pay separating employees their accrued holiday, vacation and compensatory time.  As many as six former employees were paid these sums during McCarthy's 20 year tenure as Chief of Police.

191.    The Borough is estopped to deny the formation of a contract for the aforesaid sums.

192.    The Borough will be unjustly enriched if it retains the monies that have accrued in McCarthy's escrow account in the amount set forth above.

193.    In view of the promises and inducements to McCarthy and his reliance thereon, he enjoyed an express contract with the Borough, supported by its records and/or a contract implied in law which the Borough has breached by refusing to pay him the aforesaid sums as it promised to do.

## VI.    **DAMAGE CLAIMS**

A.    Compensatory damages for breach of contract/promissory estoppel/ contract implied at law and/or unjust enrichment in excess of $88,000 (by approximation) plus interest;

B.    Compensatory damages for injury to property and liberty interests constituting violations of constitutional rights;

C.    Compensatory damages for intentional infliction of emotional and psychological distress and physical injury resulting therefrom;

D.    Compensatory damages for invasion of privacy by casting in a bad light;

E.    Compensatory damages for defamation;

F.    Punitive Damages from the individual defendants only.

35

WHEREFORE, plaintiff, Albert J. McCarthy, demands judgment in his favor and against defendants for the prayers for damages set forth above, for interest as allowed by law, reasonable attorney's fees and costs.

Respectfully submitted,

JUSTIN J. McCARTHY, ESQUIRE
Attorney for Plaintiff